# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| NICHOLAS LUCKING, | ) **ELECTRONICALLY FILED** |
| *Plaintiff*, | ) Case No. 2:23-cv-837 |
| vs. | ) |
| PENN ENTERTAINMENT, INC. F/K/A PENN NATIONAL GAMING, INC., | ) |
| *Defendant*. | ) **JURY TRIAL DEMANDED** |

## COMPLAINT IN CIVIL ACTION

Plaintiff, Nicholas Lucking, by and through the undersigned counsel, now files this Complaint in Civil Action (hereinafter, "Complaint"), averring as follows:

## PARTIES

1. Plaintiff, Nicholas Lucking (hereinafter, "Plaintiff"), is an adult individual who currently resides at 35 Solomon Street, Belle Vernon, Pennsylvania 15012.

2. Defendant, Penn Entertainment, Inc., formerly known as Penn National Gaming, Inc. (hereinafter, "PNG"), is a Pennsylvania business corporation with a registered address of Wyomissing Professional Center, 825 Berkshire Boulevard, Suite 200, Wyomissing, Pennsylvania 19610, and conducts business operations at the Meadows Racetrack & Casino, 210 Racetrack Road, Washington, Pennsylvania 15301.

## JURISDICTION AND VENUE

3. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff brings this lawsuit asserting violations of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, *et seq.* (hereinafter, "Title VII"), and the Americans with Disabilities Act of 1990, as amended by the Americans with Disabilities Act Amendments of 2008, 42 U.S.C. § 1201, *et seq.* (hereinafter, the "ADA").

4. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because Plaintiff alleges violations of the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.* (hereinafter, the "PHRA). Ultimately, as explained more thoroughly below, the factual basis for the Pennsylvania statutory law claims are so related to the ADA claims that they form part of the same case or controversy under Article III of the United States Constitution.

5. Venue is also proper in this Court because Plaintiff is a resident and citizen of Pennsylvania and a substantial part of the events or omissions giving rise to the claims averred herein occurred in the Borough of Brackenridge, Allegheny County, which is located within the geographical confines of the United States District Court for the Western District of Pennsylvania and, further, is the state in which PNG is domiciled. Therefore, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

6. This Court has personal jurisdiction over PNG because PNG routinely and regularly conducts business in the Commonwealth of Pennsylvania and routinely and regularly solicits business in Pennsylvania. As averred more fully below, PNG violated numerous provisions of Federal and Pennsylvania law, and each and every one of the events giving rise to PNG's unlawful conduct, including the harm that Plaintiff sustained therefrom, occurred in Pennsylvania. As such, this Court, at bare minimum, may exercise personal jurisdiction over PNG because PNG has the required minimum contacts with this forum for purposes of Pennsylvania's long-arm statute and the Due Process Clause of the United States Constitution.

7. Moreover, Plaintiff has satisfied all procedural and administrative requirements set forth in 29 U.S.C. § 626, 42 U.S.C. § 2000e-5, and/or g. 43 P.S. § 962(c), in that:

   a. On or about August 26, 2022, Plaintiff dual filed a timely administrative complaint with the Equal Employment Opportunity Commission (hereinafter, the "EEOC") and the Pennsylvania Human Relations Commission (hereinafter, the "PHRC"), alleging gender and disability discrimination.

   b. On or about February 28, 2023, Plaintiff received permission for the right to sue from the EEOC, wherein Plaintiff was afforded 90 days within which to timely file an action in federal or state court. With the filing of the instant Complaint, Plaintiff has hereby satisfied that procedural requirement.

   c. On or about February 28, 2023, Plaintiff received notice from the PHRC dismissing his charge of discrimination.

8. A true and correct copy of the Notice of Determination issued by the EEOC is attached hereto, made a part hereof, and marked as **Exhibit A**.

## GENERAL ALLEGATIONS

9. Prior to Plaintiff's employment with PNG, a physician diagnosed Plaintiff with an anxiety disorder and adult attention deficit hyperactive disorder (hereinafter, and collectively, "ADHD"). Notably, Plaintiff suffers from ADHD on a regular and continuous basis.

10. At all times relevant hereto, Plaintiff's ADHD rendered him disabled for purposes of the ADA and/or the PHRA because it constituted a mental impairment that substantially limited the pursuit of his major life activities, including, but not limited to, sleeping, concentrating, and taking care of himself.

11. Throughout his employment with PNG, various agents, employees, and/or servants of PNG observed – and routinely commented upon – Plaintiff's behavioral and personality characteristics which were and are inseparably associated with his underlying diagnosis of ADHD.

12. Plaintiff was and is married and presents as a heterosexual, monogamous, biological male. During the course of his employment with PNG, Plaintiff's preferences and

statuses in these regards were commonly known to numerous agents, employees, and/or servants of PNG.

13. In or around 2010, Plaintiff commenced his employment with PNG (then known as The Meadows Casino) in the position of "dealer" – *i.e.*, a "level 1" position.

14. In or around the fall of 2010, Plaintiff was promoted to the position of "dual rate supervisor" – *i.e.*, a "level 2" position. Within that role, Plaintiff ensured the accuracy and security of currency and gaming bet placements.

15. Throughout the entirety of his employment, Plaintiff received positive performance reviews and evaluations, and the management of PNG lauded his assiduousness, job skills, and work ethic.

16. In 2011, Ben Kowalski, the Table Games Director of PNG (hereinafter, "Mr. Kowalski"), actively encouraged Plaintiff to apply for a "full floor position" – *i.e.*, a full-time supervisor or "level 3" position.

17. Following Mr. Kowalski's urging, Plaintiff applied for a promotion to a "full floor position." However, Plaintiff did not receive that promotion, and the position was ultimately filled with a female who possessed substantially less experience and/or qualifications.

18. A few months later, Plaintiff, for a second time, applied for a "full floor position." However, Plaintiff was not selected and, once again, the position was filled with a female who possessed substantially less experience and/or qualifications.

19. In 2016, after years of continuing to work satisfactorily and successfully as a "dual rate supervisor," Plaintiff was approached by a few managers at PNG, and they encouraged him to again apply for a "full floor position." As before, Plaintiff applied for said position.

20. However, and for the third time, Plaintiff was denied the promotion. During the application and decision period, two other employees of PNG were promoted to higher-ranking positions, despite being substantially less qualified vis-à-vis Plaintiff. Indeed, PNG promoted one employee, a female, ahead of Plaintiff, and she effectively "skipped over" a "level" or position and obtained one that was two levels higher.

21. Notably, it is the common business practice of PNG to promote an individual to only one advancement "level" at a time. When Plaintiff inquired as to how an individual can "skip over" a position level and be promoted to two levels higher, Mr. Kowalski stated: "This was a unique circumstance."

22. In turn, Plaintiff inquired into the purported "unique circumstance" and questioned the legality of PNG's employment decision. Significantly, Mr. Kowalksi responded with the following statement: "Good luck with that, you are a male and white."

23. In late 2016, PNG scheduled Plaintiff to interview for a "full floor position" for a fourth time. On the day of the interview, Plaintiff was informed that the interview had been cancelled. The interview was then rescheduled for the following Saturday. Having been passed over for the promotion on three previous occasions, Plaintiff decided not to attend the interview due to a feeling of hopelessness and despair.

24. A few weeks later, Mr. Kowalski scheduled a meeting with Plaintiff regarding Plaintiff's decision not to attend the interview. At this meeting, Mr. Kowalski informed Plaintiff, "We know you are better than who we hired, but we had to prove a point."

25. Beginning in approximately September 2019, Mr. Atif Chaudry (hereinafter, "Mr. Chaudry") became Plaintiff's direct and immediate supervisor and/or manager.

26. In or around September 2019, Plaintiff accepted the position of Sportsbook Supervisor with PNG. Plaintiff continued to work in this capacity until March 2020, when the COVID-19 pandemic became prevalent. As a result of the pandemic, PNG eliminated and/or discontinued its operations and, almost completely, a vast majority of the employees of PNG were forced to stay at home, including Plaintiff.

27. In approximately July 2020, Plaintiff received a telephone call from Mr. Kowalski. At this point, Mr. Kowalski informed Plaintiff that the sportsbook portion of PNG's operations was being eliminated. Mr. Kowalski also invited Plaintiff to take a position in the table games section, and Plaintiff accepted.

28. Shortly after Plaintiff commenced the position in table games, PNG began to reinstate the sportsbook portion of its operations. Consequently, Plaintiff inquired as to whether he could return to his position as a Sportsbook Supervisor. However, Mr. Kowalski denied the request and further stated, "maybe one day, but not anytime soon."

29. In approximately October 2020, Plaintiff accepted a position with Live Casino in Greensburg, Pennsylvania. As part of his job duties at Live Casino, Plaintiff was required to create a sportsbook operation and train new employees in that area. In this capacity, Plaintiff was extremely successful and praised by the management of Live Casino.

30. In or around April 2021, Plaintiff became aware of an opening for a sportsbook employee position at PNG, and he discussed the possibility of reemployment with Mr. Chaudry. During the discussions, Mr. Chaudry offered Plaintiff his prior position as Sportsbook Supervisor.

31. Importantly, during their consultations, Mr. Chaudry stated that, if Plaintiff returned to PNG as a Sportsbook Supervisor, he would receive a promotion to Sportsbook Manager in "no time."

32. Ultimately, based on Mr. Chaudry's representations, and despite a $20,000.00 pay cut in his transition from Live Casino, Plaintiff accepted his prior position as Sportsbook Supervisor.

33. Subsequently, Mr. Chaudry continued to make verbal promises to Plaintiff that he would be promoted to Sportsbook Manager.

34. Plaintiff expressly advised Mr. Chaudry that he had been diagnosed with – and suffers from – ADHD.

35. Based on information and belief, Mr. Chaudry specifically knew, or, at the very least, had reason to know, that Plaintiff is a married, heterosexual, and monogamous male.

36. Beginning in approximately March of 2022, Mr. Chaudry began making verbal comments to Plaintiff that were of an overt and extreme sexual nature, specifically related to Mr. Chaudry's openly and self-disclosed participation in the "swinger community." The frequency of these comments occurred on a weekly basis, were sexually graphic, and were oftentimes overheard by Plaintiff's coworkers.

37. The sexually hostile verbal comments described above consisted of statements promoting the fact that Mr. Chaudry frequented swinger community clubs and discussing, in explicit detail, the activities that comprise the swinger community clubs, including Mr. Chaudry and his multiple sexual partners and the various sexual acts that they performed.

38. In addition. Mr. Chaudry informed Plaintiff that it was his desire to engage in sexual intercourse with a coworker's wife.

39. When subjected to the above-mentioned sexually hostile comments, Plaintiff visibly shook his head in disbelief and removed himself from the vicinity of Mr. Chaudry. In so

doing, Plaintiff politely conveyed that the comments were unwelcome and inappropriate for the workplace setting.

40. Immediately thereafter, Mr. Chaudry began isolating Plaintiff and deprived him of information that was pertinent and vital to his job duties as Sportsbook Supervisor.

41. Instead, Mr. Chaudry shared this information with an employee who was subordinate to Plaintiff, namely Josh Herman (hereinafter, "Mr. Herman"), in an apparent effort to sabotage and/or thwart Plaintiff's work performance while, at the same time, displaying preferential treatment and bias toward Mr. Herman.

42. In approximately April 2022, Mr. Chaudry announced that he had accepted a promotion within PNG. Mr. Chaudry further announced that there was an opening for the position of Sportsbook Manager. As before, Plaintiff expressed his interest in and desire to apply for that position, which would have been a promotion from his then-current position of Sportsbook Supervisor.

43. On or about April 14, 2022, Plaintiff's father passed away, further exacerbating Plaintiff's mental condition and ADHD.

44. Shortly thereafter, in late April 2022, Plaintiff interviewed for the position of Sportsbook Manager.

45. More specifically, Plaintiff had two interviews. The first interview was with Mr. Chaudry and Mr. Kowalski and lasted ten minutes. The second interview was with Defendant's General Manager, Tony Frabbiele (hereinafter, "Mr. Frabbiele").

46. At all times relevant, Mr. Chaudry freely shared his email password with Plaintiff, Mr. Herman, and several other coworkers, in order to permit them to complete work-related tasks.

47. On or about June 9, 2022, while checking Mr. Chaudry's email for a work-related matter, Plaintiff observed an email correspondence from Mr. Kowalski to Mr. Chaudry. The substantive text of this email stated, "talk to Nick, offer position to Josh," *i.e.*, Mr. Herman.

48. Sometime in June 2022, Plaintiff was forced to take a medical leave of absence at approximately the end of June 2022.

49. On or about July 2, 2022, Plaintiff met with Mr. Frabbiele, at which point Mr. Frabbiele informed Plaintiff that he had been passed over for the promotion to the position of Sportsbook Manager. In so doing, Mr. Frabbiele stated that it was a "group decision," involving the input and advice of both Mr. Kowalski and Mr. Chaudry, and that the position was offered to and accepted by Mr. Herman.

50. Upon information and belief, Mr. Herman does not suffer from ADHD or a mental disability that otherwise falls within the category of psychological anxiety disorders.

51. Moreover, Mr. Herman was not a Sportsbook Supervisor. Therefore, when Mr. Herman accepted the position of Sportsbook Manager, Mr. Herman effectively "skipped over" Plaintiff, despite possessing less seniority and PNG's business policy of promoting an individual to only one advancement "level" at a time.

52. Upon information and belief, Mr. Herman did not openly protest or rebuke Mr. Chaudry in his involvement with the swinger community. To the contrary, and unlike Plaintiff, Mr. Herman actively supported Mr. Chaudry and his sexual preferences and requested details from Mr. Chaudry with respect to his sexual escapades.

53. Undoubtedly, Plaintiff's superior qualifications, particularly his experience as Sportsbook Supervisor at PNG and job duties at Live Casino, in conjunction with his earned seniority above and beyond that of Mr. Herman, renders Plaintiff the most qualified and

knowledgeable individual of the two with regard to the skills applicable and knowledge necessary for the position of Sportsbook Manager.

54. As a direct and proximate result of PNG's failure to redress and remediate the discriminatory behavior and sexually hostile work environment set forth herein, Plaintiff was left with no choice but to sever his employment with PNG on August 20, 2022, and was constructively discharged by PNG.

## COUNT I
## FAILURE TO PROMOTE ON THE BASIS OF GENDER AND SEXUAL ORIENTATION
## IN VIOLATION OF TITLE VII AND THE PHRA
### (Sportsbook Manager Position)
### 42 U.S.C. § 2000e, *et seq.* and 43 P.S. § 951, *et seq.*

55. Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

56. A failure-to-promote claim "requires a Title VII plaintiff to show (i) that he belongs to a [protected category]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *Noel v. The Boeing Co.*, 622 F.3d 266, 274 (3d Cir. 2010), citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

57. As Title VII prohibits discrimination on the basis of sexual orientation as part of the phrase "because of gender," that same phrase likewise encompasses and affords protection to the practice of monogamy. See *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020).

58. As averred above, Plaintiff applied for the Sportsbook Manager Position and was the most qualified candidate for the position.

59. However, PNG hired a less qualified applicant, namely Mr. Herman.

60. At all times relevant hereto, Plaintiff possessed a level of experience and qualifications that were significantly superior to that of Mr. Herman.

61. Plaintiff was and is a heterosexual male who practices monogamy.

62. By contrast, Mr. Chaudry was openly polyamorous.

63. Upon information and belief, Mr. Chaudry was the deciding factor in determining who was hired for the Sportsbook Manager Position, and he chose to hire Mr. Herman over Plaintiff because the latter condoned or supported polyamory while the latter did not.

64. Therefore, PNG violated Title VII and/or the PHRA in failing to promote Plaintiff on account of his sexual orientation.

65. As a direct and proximate result of PNG's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and he is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

### COUNT II
### FAILURE TO PROMOTE ON THE BASIS OF DISABILITY
### IN VIOLATION OF THE ADA AND THE PHRA
### (Sportsbook Manager Position)
### 42 U.S.C. § 1201, *et seq.* and 43 P.S. § 951, *et seq.*

66. Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

67. The elements of a prima facie case of disability discrimination under the ADA for failure to promote are: (1) plaintiff is disabled as defined by the statute; (2) plaintiff was qualified

for the job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *Martin v. Allegheny Airlines, Inc.*, 126 F. Supp. 2d 809, 815 (M.D. Pa. 2000). See *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 142 (3d Cir.1998) (en banc); *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

68. As previously averred, Plaintiff suffers from the Disability and is "disabled" for purposes of the ADA and PHRA.

69. Plaintiff informed managerial personnel at PNG that he suffers from the Disability, including both Mr. Kowalski and Mr. Chaudry.

70. To reiterate, Plaintiff applied for the Sportsbook Manager Position and was the most qualified candidate for the position.

71. At all times relevant hereto, Plaintiff possessed a level of experience and qualifications that were significantly superior to that of Mr. Herman.

72. However, PNG hired Mr. Herman.

73. Although Plaintiff was and is disabled, Mr. Herman was not.

74. As such, PNG violated Title VII and/or the PHRA in failing to promote Plaintiff on account of his disability.

75. As a direct and proximate result of PNG's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and he is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

### COUNT III
### HOSTILE WORK ENVIRONMENT ON THE BASIS OF GENDER AND SEXUAL ORIENTATION
### IN VIOLATION OF TITLE VII AND THE PHRA
### 42 U.S.C. § 2000e, *et seq.* and 43 P.S. § 951, *et seq.*

76. Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

77. In order to state a claim under Title VII for discrimination resulting from a hostile work environment, an employee must show that (1) the employee suffered intentional discrimination because of his sex, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected the employee, (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position, and (5) the existence of *respondeat superior* liability. *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001).

78. To recapitulate, as part of his sexual orientation, Plaintiff has sexual intercourse with one female and only one female.

79. By way of comparison, Mr. Chaudry was openly polyamorous and, upon information and belief, engaged in both heterosexual and homosexual relationships.

80. On routine and consistent basis, Mr. Chaudry, a supervisory employee who was vested with the authority and power to alter the terms and conditions of PNG's employees and their employment relationship, made highly sexualized comments in front of Plaintiff pertaining to the "swinger lifestyle" that Mr. Chaudry subscribed, the various sexual partners that he engaged with, and the numerous sexual acts that he performed on his heterosexual and homosexual mates.

81. Ultimately, the above-mentioned comments persisted on a weekly basis, two to three times per week, from March 2022 to July 2022 and were so sufficiently severe and/or pervasive that they altered the terms and conditions of Plaintiff's employment.

82. The comments were unwelcome to Plaintiff, and he considered them to be highly offensive.

83. Any reasonable person in Plaintiff's shoes would consider the comments to be unwelcome, highly offensive, sufficiently severe and/or pervasive enough to alter the terms and conditions of employment.

84. Because Mr. Chaudry was a high-ranking supervisory employee, PNG is vicariously liable for his actions.

85. Alternatively, when Plaintiff rebuffed the sexualized statements of Mr. Chaudry, he informally protested the existence of a sexually hostile work environment.

86. Although PNG had sufficient time to abate the sexually hostile work environment, it failed to do so.

87. Accordingly, PNG violated Title VII and/or the PHRA in creating, sustaining, and failing to rectify a sexually hostile work environment.

88. As a direct and proximate result of PNG's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and he is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

## COUNT IV
## CONSTRUCTIVE DISCHARGE ON THE BASIS OF GENDER AND SEXUAL ORIENTATION IN VIOLATION OF TITLE VII AND THE PHRA
## 42 U.S.C. § 2000e, *et seq.* and 43 P.S. § 951, *et seq.*

89. Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

90. Notably, constructive discharge occurs when an "employer knowingly permits conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 887 (3d Cir. 1984).

91. Plaintiff is a heterosexual monogamous male.

92. In 2011, 2012, and 2016, Plaintiff applied for a "full floor position" three times. Although Plaintiff was substantially more qualified than the other applicants, Mr. Kowalski hired three females instead.

93. The gender-based animus of Mr. Kowalski is established by the fact that when Plaintiff questioned the legality of Mr. Kowalski's hiring practices, Mr. Kowalski stated: "Good luck with that, you are a male and white."

94. Moreover, in March 2022, Mr. Chaudry instituted and perpetrated the above-described sexually hostile work environment.

95. Shortly thereafter, it is believed and therefore averred that Plaintiff's sexual orientation and objection to discussing sex at work was a factor in Mr. Chaudry passing Plaintiff over for available positions.

96. Ultimately, given the pattern and practice of discrimination on the basis of gender and sexual orientation, detailed and described hereinabove, any reasonable person standing in the shoes of Plaintiff would resign from employment.

97. In August 2022, the cumulative effects of the workplace environment and conditions became so intolerable that Plaintiff resigned his employment with PNG.

98. Therefore, PNG violated Title VII and/or the PHRA in constructively discharging Plaintiff.

99. As a direct and proximate result of PNG's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and he is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

## **REQUESTS FOR RELIEF**

WHEREFORE, Plaintiff, Nicholas Lucking, respectfully requests this Honorable Court to enter judgment in his favor and against Defendant, Penn Entertainment, Inc., formerly known as, Penn National Gaming, Inc., and award all damages available at law and equity, as follows:

1. Declare and find that Defendant committed one or more of the following acts:

    i. Violated Title VII and/or the PHRA in failing to promote on the basis of sexual orientation;

    ii. Violated the ADA and/or the PHRA in failing to promote on the basis of Plaintiff's disability;

    iii. Violated Title VII and/or the PHRA in creating, sustaining, and failing to remediate sexually hostile work environment;

    iv.  Violated Title VII and/or the PHRA in constructively discharging Plaintiff on the basis of his gender and/or sexual orientation;

2.  Award compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, suffering, mental anguish, inconvenience, and loss of enjoyment of life;

3.  Award equitable relief in form of back pay and front pay;

4.  Award punitive damages sufficient to deter PNG from engaging in future conduct of a similar nature;

5.  Award attorney's fees; and/or

6.  Award pre-judgment and continuing interest as calculated by the Court.

**JURY TRIAL DEMANDED ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

**THE WORKERS' RIGHTS LAW GROUP, LLP**

Date: May 18, 2023    By: _____

    Erik M. Yurkovich (Pa. I.D. No. 83432)
    Kyle H. Steenland (Pa. I.D. No. 327786)

    The Workers' Rights Law Group, LLP
    Foster Plaza 10
    680 Andersen Drive, Suite 230
    Pittsburgh, PA 15220
    Telephone: 412.910.9592
    Facsimile: 412.910.7510
    kyle@workersrightslawgroup.com

    *Attorney for Plaintiff, Nicholas Lucking*

## **VERIFICATION**

      I, Nicholas Lucking, have read the foregoing Complaint in Civil Action and verify that the statements therein are correct to the best of my personal knowledge, information and/or belief. I understand that this verification is made subject to the penalties of 18 Pa. C.S.A. 4904 relating to unsworn falsification to authorities, which provides that if I knowingly make false averments, I may be subject to criminal penalties.


Dated: _____

                                                                          Plaintiff, Nicholas Lucking